IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TONI D. DeLONG,                              §
                                             §
          Plaintiff,                         §
                                             §
V.                                           §          CIVIL ACTION NO. H-06-991
                                             §
MICHAEL J. ASTRUE,                           §
COMMISSIONER OF THE SOCIAL                   §
SECURITY ADMINISTRATION,                     §
                                             §
          Defendant.                         §

<u>**MEMORANDUM AND ORDER DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment and Brief in Support (Document No. 19), Defendant's Motion for Summary Judgment and

Memorandum in Support (Document No. 10), and Defendant's Response to Plaintiff's Motion for

Summary Judgment (Document No. 21). Having considered the cross motions for summary

judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the

reasons set forth below, that Plaintiff's Motion for Summary Judgment (Document No. 19) is

DENIED, Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, and the

decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on July 6, 2006. (Document No. 9).

## I. Introduction

Plaintiff Toni Delong ("Delong") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB"). Delong argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Janis Estrada, committed errors of law when she found that Delong was not disabled, that she had the residual functional capacity to perform sedentary work involving simple, repetitive tasks in a low stress setting, and could perform jobs such as an order clerk, sorter, and addresser. Delong contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision. According to Delong, the ALJ erred by failing to give controlling weight to her treating physician's opinion concerning the nature, severity, and limitations of fibromyalgia, and by failing to formulate a hypothetical question for the vocational expert that incorporated all the residual functional limitations caused by fibromyalgia, chronic fatigue syndrome, and knee impairments. Delong moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claims for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Delong was not disabled as a result of her impairments, that the decision comports with applicable law, and that it should therefore be affirmed.

## II. Administrative Proceedings

Delong applied for DIB benefits on July 11, 2003, claiming that she has been unable to work since February 1, 2001, due to fibromyalgia, chronic fatigue syndrome, temporomandibular joint disorder ("TMJ"), and Raynaud's syndrome.    (Tr. 713-715, 723).    The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 687-688).  After that, Delong requested a hearing before an ALJ. (Tr.700-701).  The Social Security Administration granted her request (Tr. 702-704), and the ALJ held a hearing on July 16, 2004, at which Delong's claims were considered *de novo*.  (Tr. 984-1030).  On August 26, 2004, the ALJ issued her decision finding Delong not disabled.  (Tr. 671-686).  The ALJ, as an initial matter, found that Delong was insured for DIB purposes only through December 31, 2003, and as a result, she had to establish that she was disabled on or before that date in order to be entitled to benefits.  Next, the ALJ found that Delong had not engaged in substantial gainful activity since the alleged onset of disability.  At steps two and three, the ALJ found that Delong has fibromyalgia, degenerative changes of the spine and knees, and a depressive disorder with anxiety, all of which are severe impairments within the meaning of the Act, but that these impairments did not meet or equal the requirements of a listed impairment.  Also, the ALJ found that the other two impairments alleged by Delong, Raynaud's syndrome and TMJ, were not severe impairments.  At step four, the ALJ concluded that Delong's testimony was not fully credible.  She further concluded that Delong had the residual functional capacity ("RFC") for sedentary work involving simple, repetitive tasks in a low stress work setting. In addition, the ALJ found that Delong could not return to her past relevant work.  At step five, based on Delong's RFC, and the testimony of Thomas King, Ph.D., a vocational expert, the ALJ, using the Medical-Vocational Guidelines as a framework, *see* Appendix 2, Subpart P, Social Security

Regulations No. 4, Rule 201.28, concluded that Delong could perform unskilled sedentary jobs such as an order clerk, sorter, and addresser, all of which are jobs that exist in significant numbers in the regional and national economy, and that she was, therefore, not disabled within the meaning of the Act on or about the expiration of her insured status on December 31, 2003.

Delong then asked for a review by the Appeals Council of the ALJ's adverse decision. (Tr. 666-667). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. §§ 404.970, 416.1470. After considering Delong's contentions, including the Attorney's brief in support of Request for Review of Hearing Decision dated January 30, 2006, (Tr. 8-48), and medical records including those from the Fibromyalgia and Fatigue Center, Cy-Fair ENT, Houston Arthritis Associates and a fibromyalgia RFC completed by Dr. Little on August 16, 2005, in light of the applicable regulations and evidence, the Appeals Council concluded, on February 23, 2006, that there was no basis upon which to grant Delong's request for review. (Tr. 3-6). As to the new medical records, the Appeals Council declined to reopen the matter based on the new evidence. The Appeals Council wrote:

> The ALJ decided your case through December 31, 2003, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.

The ALJ's findings and decision thus became final. Delong has timely filed her appeal of the ALJ's decision. *See* 42 U.S.C. § 405(g). Both Delong and the Commissioner have filed Motions for

Summary Judgment (Document Nos. 10 & 19).  Also, Delong has attached medical records from Masroor Ahmed, M.D, relating to his treatment of Delong from September 2005 through October 2005.  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 1030.  (Document No. 5).  There is no dispute as to the facts contained therein.


### III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).

Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which [she] lives, or whether a specific job vacancy exists for
[her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in

any substantial gainful activity." *Anthony,* 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284

(5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of

proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that

other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner

determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found that Delong, as of the date she was last insured or December 31, 2003, despite her impairments and limitations, could perform sedentary work involving simple, repetitive tasks in a low stress setting.  The ALJ further found that even though Delong could not perform her past relevant work, she could perform other jobs such as an order clerk, sorter, and addresser  and that she therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Delong had complained of and has been treated for fibromyalgia, chronic fatigue syndrome, TMJ, and Raynaud's syndrome.

With respect to TMJ, the medical records show that Delong's dentist, Dr. Donald Cohen diagnosed Delong with myofascial pain and TMJ dysfunction in the Spring of 2003, and that based on this diagnosis, Delong was referred for physical therapy. (Tr. 777).  Delong underwent an evaluation on March 31, 2003, at the TIRR rehabilitation Center.  (Tr. 763-766).  The physical therapist's report shows that Delong had obvious stress points.  The evaluator summarized Delong's problems as follows:

8

1.   Patient with decreased soft tissue mobility moderate to severe tautness and tenderness in both lateral, medial pterygoid muscles, masseter–right is greater than left in TMJ.  Moderate muscular shortening in both upper trapezious, levator scapula, SCM, scalenes and longus coli in Lumbar spine, limiting functional ability to eat, sleep without pain.

2.   Patient with decreased AROM moderate loss of cervical flexion and rotation in cervical spine, limiting functional ability to perform daily routines without neck pain.

3.   Patient with abnormal muscle recruitment pattern–clinching and grinding of jaw, causing increased stress on surrounding soft tissues.

4.   Patient lacks appropriate independent HEP and understanding of neck care.  (Tr. 763).

According to the treatment notes, Delong was "less emotional" at her April 8, 2003, session, and she reported that her "jaw was not quite so painful" on April 10, 2003.  (Tr. 771, 772).  Delong also had therapy on April 22, and April 25, 2003.  (Tr. 768, 769).

The medical records further show that Delong complained of and was treated for knee pain. On October 3, 2002, Delong went to James P. Fogarty, M.D. complaining of discomfort in her left knee.  Delong reported to Dr. Fogarty that she previously had a "slipped femoral capital epiphysis of the right hip for which she underwent a pinning and is apparently asymptomatic."  (Tr. 792).  In connection with her evaluation, Delong had an x-ray taken of her left knee which showed "normal tibiofemoral compartment space. There is some evidence of patellofemoral narrowing and some evidence of lateral patellar tilt."  (Tr. 792).  Dr. Fogarty's examination of the left knee showed "minimal patellofemoral crepitation.  There is no significant discomfort with patellofemoral compression.  There is no joint effusion or joint line tenderness.  McMurray and Lachman exams were negative."  (Tr. 792).  Based on the x-ray and his manipulation of Delong's left knee, Dr. Fogarty opined that Delong had chondromalacia patella.  (Tr. 792).  At Delong's next appointment

on November 7, 2002, Dr. Fogarty noted that Delong had a good range of motion in her knee.  Dr. Fogarty further noted that the left quads were weaker than on the right.  Also, Delong had a positive apprehension sign on the left and the McMurray exam was "equivocal for possible thorn lateral meniscus."  (Tr. 791).  Because of these changes, Dr. Fogarty opined that Delong had "possible rheumatoid arthritis as she has multiple joint complaint."  (Tr. 791).  Thereafter, Dr. Fogary referred Delong for a MRI of both knees, which she underwent on November 9, 2002.  The results of the MRI of the right knee showed "mild linear degenerative signal change in the anterior horn of the lateral meniscus and popliteal cyst in a lateral location."  (Tr. 790, 903).  The results of the MRI of the left knee showed a "complex tear in the anterior horn of the lateral meniscus and degenerative signal change in the posterior horn of both menisci."  (Tr. 789, 902).  Based on the MRI results, Dr. Fogarty recommended that Delong undergo arthroscopy with chondroplasty, which she successfully underwent on November 26, 2002.  (Tr. 787-788).  At Delong's follow-up appointment a week later (December 3, 2002), Dr. Fogarty wrote that Delong was "doing very well."  (Tr. 786).  Similarly, at Delong's December 19, 2002, appointment, she reported doing well. (Tr. 785).  Delong was not seen again by Dr. Fogarty until March 13, 2003, at which time she complained of pain in her left knee and elbow.  Delong reported the onset of the increased joint pain and swelling around the same time she had a viral illness and severe sinus infections. (Tr. 784).  The results of Delong's physical examination confirmed the swelling.  Dr. Fogarty wrote:

> There is swelling in multiple joints of the hands and fingers, bilaterally.  There is tenderness over the medial elbows, slight numbness along the ulnar side of the forearm and wrist.  On both knees, there is some swelling.  The left knee has tenderness and swelling, laterally.  There is pain laterally.  The right knee is fairly unremarkable. (Tr. 784).

10

Given these findings, Dr. Fogarty opined that Delong had "post meniscectomy syndrome, left knee, bilateral medial epicondylitis, and probably some sort of post viral polyarthropathy." (Tr. 784). Two months later, Delong returned for a follow up appointment on May 6, 2003. Her examination by Dr. Fogarty showed that Delong had a good range of motion in her neck but tenderness was noted on both elbows on the "medial epicondyle, more on the right than the left. There is also tenderness over the ulnar nerve in the grooves, bilaterally." Even though Delong complained of numbness in her fourth and fifth fingers, Dr. Fogarty recorded that she had good grip strength. Based on these objective clinical findings, Dr. Fogarty opined that Delong had "resolved chondromalacia, left knee, chondromalacia, right knee, probably needs intervention and bilateral medial epicondylitis and tardy ulnar palsy." (Tr. 783). Delong had a follow up appointment for her knee on September 18, 2003. (Tr. 829-830). According to the treatment note, Delong had a good range of motion in her right knee and had minimally positive apprehension sign. As to her left knee, Delong had "a positive apprehension sign. Lachman's and drawer seem negative. There is a mild effusion present. There is patellofemoral and tibiofemoral crepitation." (Tr. 829). Finally, the examination of Delong's leg revealed that her distal neurovascular status was intact with normal distal sensation and pulses, and she had a fairly good range of motion. Also, Delong had bilateral ankle swelling. (Tr. 829-830). Delong was refered for an MRI of the cervical spine, which she had taken on October 3, 2003. (Tr. 827-828). The MRI revealed the following:

2. Shallow right posterior paracentral disc protrusion at C6-7 indents the thecal sac.

3. Slight lateral unconvertebral spacing at C3-4, C5-6 at C6-7 levels; no significant foraminal stenosis or lateral nerve impingement seen.

4. Developmentally small central spinal canal, measuring approximately 1.2 cm AP diameter, snug for the cord; no focal stenosis, cord or nerve impingement seen.

    5.   Straightened cervical lordosis, suggesting muscle spasms.  (Tr. 827, 898).

Because the MRI suggested muscle spasms, and given Delong's long standing complaints of pain, she was seen by a different doctor in Dr. Fogarty's group specializing in pain managment, Dr. Matthew Cubbage.  Delong's first appointment with Dr. Cubbage was on October 16, 2003.  (Tr. 823-825).  Dr. Cubbage diagnosed Delong as having spondylosis cervical, no myelopathy.  Overall, Dr. Cubbage recorded that Delong's range of motion was normal and there was no tenderness to palpation.  He did, however, find Delong to be depressed.  Delong was not seen again by Dr. Cubbage until June 3, 2004.  The results of Delong's physical examination showed that Delong had good strength and normal reflexes, bilaterally in the upper extremities.  Her shoulder exam was negative bilaterally.  Also, Dr. Cubbage found that Delong had **"**pain with reflex testing, however, secondary to her subjective complaints of fibromyalgia.  She also has fairly dense trapezius and axial neck spasm."  (Tr. 893-894).  Based on these clinical findings, Dr. Cubbage referred Delong for aquatic physical therapy.  Delong underwent a physical therapy assessment on June 17, 2004.  The physical therapist completed a Statement of Medical Necessity regarding Delong's medical need for physical therapy to improve her range of motion, function/mobility and endurance and to decrease musculoskeletal tightness.  (Tr. 881).

Delong also complained of and was treated for sinus problems.  The records reflect that she was seen by Dr. Diane S. Davis on September 24, 2003.  (Tr. 818-819).  According to the treatment note, Delong complained of "increasing headache, facial pain, sore throat, and fatigue**."**  Dr. Davis opined that Delong had recurrent acute/chronic sinusitis and prescribed Levaquin.  (Tr. 818-819).  In addition, on December 3, 2004, Delong had a CT scan of her paranasal sinuses.  The CT scan

results showed "1. acute bilateral maxillary sinusitis. 2. right sphenoid sinusitis. 3. rhinitis." (Tr. 818).

With respect to Delong's diagnosis of and treatment for fibromyalgia and CFS, the records show that Delong was diagnosed with these conditions by Arif Ali, M.D., practicing with Northwest Houston Arthritis Center, P.A. The notes of Delong's April 3, 2003, initial evaluation show that Delong complained of the following:

> excessive fatigue, muscle weakness, insomnia, tender points in muscles, generalized weakness in both upper and lower extremities, back pain, dizziness, pleuritic chest pain, headaches associated with sinus trouble, and weight gain of approximately ten pounds in the last four months. She is complaining of depression, anxiety, easy bruising, and joint pain and joint stiffness of the knees, ankles, shoulders and hip joints. (Tr. 804).

The results of Dr. Ali's examination of Delong revealed no enlarged lymph nodes in the neck. Her thyroid was normal in size and her oropharynx was clear. As to Delong's extremities, Dr. Ali noted that there was no cyanosis or swelling, the cranial nerves were normal and the sensory exam was also normal. In addition, the deep tendon reflexes were 1+ and equal in both upper and lower extremities, knees, ankles, biceps and triceps. Delong's muscle strength was grade 5 in both upper and lower extremities, and she had no skin tightness or rash. Also, "there were tender trigger points present medially and laterally in both elbows, both knees, upper back, and sternoclavicular joints were tender." (Tr. 804-805). Because of the tender trigger points, Dr. Ali opined that Delong had fibromyalgia. (Tr. 805). Following this diagnosis, the records reflect that Delong returned for a follow-up appointment on April 15, 2003. Dr. Ali encouraged her to exercise. (Tr. 797, 798). At Delong's next appointment on May 12, 2003, Dr. Ali noted that Delong was tender at both the elbow

and knee.  The notes from Delong's next follow up appointment on July 14, 2003, show Dr. Ali opined that Delong has CFS and Raynaud's syndrome.  (Tr. 794-796).

In October 2003, Delong commenced treatment with Dr. Patricia Salvato, an internist specializing in chronic fatigue syndrome.  In connection with Delong's initial evaluation by Dr. Salvato, she had an ECG and blood work.  (Tr. 863-879).  Blood work revealed that Delong tested positive for the Epstein Barr antigen.  (Tr. 875).  The treatment notes from Delong's first appointment on October 3, 2003, show that Delong had a temperature of 99.7.  Also, the results of the examination of Delong's musculoskeletal system showed she had 16/18 tender points.  The results of her neurological examination showed that her cranial/nerves were grossly intact; her motor strength was 5/5, she was positive to light touch, her reflexes were 2 plus, she had a negative Romberg, and Babinski (toes down).  (Tr. 868).  Delong had a follow up visit with Dr. Salvato on October 22, 2003, at which time she had a temperature of 99.0, complained of a sore throat, and had 12/18 tender points.  (Tr. 860).  Because Delong had applied for DIB, Dr. Salvato wrote a "To Whom it May Concern" letter dated January 22, 2004, in which she summarized Delong's condition, based on her examination of Delong and the other clinical tests, including blood work.  Dr. Salvato wrote:

> Toni DeLong is a 38-year-old female patient under my care.  She initially presented to my office on 10/06.2003 with a diagnosis of Fibromyalgia, Chronic Fatigue Syndrome, and TMJ, by Dr. Ali.  She described unrelenting fatigue which began 2 years ago at which time she experienced a persistent sinusitis which lasted approximately 8 months.  Along with her fatigue, she experienced symptoms of swollen lymph nodes, widespread pain, headaches and significant cognitive difficulties, i.e, memory/concentration problems.  She has not been able to recover since that time and suffers from recurrent symptoms which have rendered her unable to maintain employment.

14

Physical exams in my office have been remarkable non-exudative pharyngitis, enlarged cervical lymph nodes, low grade fevers, and 16 of 18 positive tender points, above and below the waist, on the right and left side of the body. Laboratory testing has indicated a low natural killer cell function, characteristic of what is seen in patients with Chronic Fatigue Syndrome. Mrs. Delong is currently undergoing symptomatic treatment with weekly Gluthathione/ATP injections, Flexeril 5 mg t.i.d, Bextra 20 mg a day, Hydrocodone 5/500 mg b.i.d, Xanax .5 mg b.i.d, Ambien 10 mg quh, Effexor XR 150 mg b.i.d. Despite various treatment modalities, she has not experienced significant or sustained relief of symptoms.

DIAGNOSIS

During the course of her treatment with me, Ms. Delong has demonstrated findings of non-exudative pharyngitis on two out of three visits. Objective data supporting the diagnosis of CFS are frequent sore throat and low grade fevers as well as lymphadenopathy. Other objective findings are low natural killer cell function as low as 126. The medical literature supports normal values for someone her age are more in the 300-500 range, so by those definitions, Ms. Delong does have a low natural killer cell function. This is not the source of my diagnosis of CFS, but it is a supportive test for following her response to various treatments. As noted below, other diseases have been ruled out that can manifest similarly, to include lupus, rheumatoid, leukemia, and liver disease. She has evidence of elevated Epstein-Barr early antigen viral titers consistent with a re-activated viral infection. She has a normal coritisol level and normal Thyroid stimulating hormone. She has negative Lyme disease testing. Based on review of her past medical records, history and physical exam, and laboratory testing, it is my opinion that Ms. Delong meets the criteria for CFS, i.e., clinically evaluated, unexplained, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., not life-long), is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social or personal activities. This patient definitely meets this criteria in that her fatigue meets all of the descriptors mentioned.

In addition, the patient must have the concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration, sore throat, tender lymph nodes, muscle pain, multi-joint pain without swelling or redness, headaches, unrefreshing sleep, and post exertional malaise lasting more than 24-hours. These symptoms must have persisted or recurred during six or more consecutive months of illness. If you review this patient's chart thoroughly, including her initial history and physical, you will note that she has unrefreshing sleep, muscle pain without swelling, multi-joint pain, sore throat, problems with memory and concentration, recurring headaches, and fevers. You will also find

throughout her records that the patient has had episodes of erythema diagnosed on physical exam by both me and my nurse practitioner.

MEDICAL ASSESSMENT

Ms. Delong was last examined by me on 12/24/03, at which time she continued to describe significant symptomatology which continue to prevent her from engaging in prolonged sitting, standing and walking, understanding, remembering, and following on even simple instructions, interacting with others and maintaining a satisfactory work presence. She described increasing severity of her fatigue and a significant intensification of her cognitive abilities. The limitations reported by the patient are credible as they are consistent with characteristics of CFS. On physical exams, she has evidence of non-exudative pharyngitis and she continues to meet the American College of Rheumatology tender point criteria for Fibromyalgia.

Ms. Delong has experienced a greater than 50% decrease in her ability to perform her activities of daily living. She has difficulty concentrating because of her pain and headaches and she continues to experience a constant fatigue, that is unrelieved by rest. Due to Ms. Delong's continued symptoms, she continues to be unable to maintain a constant or steady performance of any prolonged physical or mental activity. She is unable to sit, stand or walk for prolonged periods and requires frequent rest periods throughout the day. She is unable to withstand the physical and mental demands of job schedules and stressors. She is unable to maintain regular attendance on the job or be punctual within customary tolerances. Her cognitive dysfunction limits her ability to function professionally as she has problems concentrating on material presented orally or in writing.

It is my firm medical judgment, based on evidence-based medicine, that Ms. Delong lacks the capacity to be gainfully employed on a regular, sustained basis due to her diagnosis of Chronic Fatigue Syndrome and Fibromyalgia. The debilitating fatigue and weakness she experiences and her inability to stand for prolonged periods or concentrate on a task for more than a few minutes at a time, severely impair her ability to function in full-time, or even part-time employment on a consistent basis. I consider this patient totally disabled from gainful employment for at least the next consecutive 12 months. (Tr. 854-856).

Likewise, Dr. Salvato wrote a follow up letter dated June 1, 2004, in which she reiterated her earlier

January 22, 2004, letter, and also responded to Dr. Pearlman's April 26, 2004, report, in which Dr.

16

Pearlman opined that Delong had a dependent personality disorder.  With respect to Dr. Pearlman's

opinion, Dr. Salvato wrote:

> I do not disagree that Ms. Delong could be demonstrating the hallmark features of
> dependent personality disorder, however, this does not rule out the diagnosis of
> chronic fatigue syndrome, nor fibromyalgia. (Tr. 852).

Finally, Delong was seen by Dr. Salvato on August 16, 2004.  (Tr. 908-938).  According to

the treatment note, Delong had a temperature of 97.9, and had 12/18 tender points.  Dr. Salvato

recommended that Delong begin a pain protocol.  (Tr. 909).

Delong also received treatment for depression.  From May 26, 2001, through November 9,

2001, she was treated by Dr. Daniel Koppersmith for her complaints of crying, marriage problems,

and anxiety.  (Tr. 760-762).  At her initial visit on May 26, 2001, Delong had a GAF of 45 and she

was diagnosed as having a moderate depressive disorder.[2]  Dr. Koppersmith prescribed Celexa for

depression, Sonata for sleep and Xanax for anxiety.  (Tr. 762).  At Delong's next appointment on

June 15, 2001, she reported better sleep with Sonata, and Dr. Koppersmith prescribed Wellbutrin,

a different anti-depressant, to boast Delong's energy.  (Tr. 761).  Delong reported at her July 13,

---

[2] Because mental disorders are often characterized by impairments in several areas, diagnosis
requires a multiaxial evaluation.  Axis I refers to the individual's primary clinical disorders that will
be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to
general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis
V refers to the clinician's assessment of an individual's level of functioning, often by using a Global
Assessment of Functioning rating (GAF), which does not include any physical limitations.  *See*
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-
IV), (4th ed. 1994).

The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's
judgment of the individual's overall level of functioning."  *Id.* at 30.  A GAF score is a measurement
"with respect only to psychological, social and occupational functioning."  *Boyd v. Apfel*, 239 F.3d
698, 708 (5th Cir. 2001) (citing DSM-IV at 32).  A GAF of 41-50 indicated "serious symptoms (e.g.,
suicidal ideations, severe obsessional rituals, frequent shoplifting), or any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

2001, office visit that she had "better results with the Wellbutrin." (Tr. 760).  The August 24, 2001, treatment note reflects that Delong's improvement on Wellbutrin was short-lived.  She reported an adverse side effect and also reported that Sonata was no longer working.  (Tr. 760).  In response to Delong's complaints, Dr. Koopersmith prescribed Paxil for depression.  (Tr. 760).  Delong reported feeling better at her next office visit on September 14, 2001.  According to Delong, "Paxil has taken away the rage." (Tr. 760).  At her last appointment with Dr. Koopersmith on November 9, 2001, Delong reported that even with Paxil, she had some rage around her cycle.  (Tr. 760).

In 2003, Delong went to counseling provided by Elise Gunst.  (Tr. 834-838).  The notes from Delong's first visit on August 25, 2003, show that Delong sought treatment for "stress associated with chronic pain, fibromyalgia, CF IDS, relationship issues." (Tr. 836).  Delong had appointments with the counselor on September 10, 2003, September 15, 2003, October 1, 2003, October 24, 2003, and October 31, 2003.  (Tr. 833-832).  Also, around the same time, Delong was seen by her gynecologist, Dr. Yvonne Smith, on September 22, 2003, and again on December 15, 2003, at which time Delong reported that the Effexor was only minimally helping.  (Tr. 840).

Delong underwent a mental status examination by Theodore Pearlman, M.D., on April 26, 2004.  Dr. Pearlman completed a form named "Medical Source Statement of Ability to do Work Related Activities (Mental) (Tr. 848-849), in which he evaluated Delong's ability to work using a rating scale of "none", "slight", "moderate", "marked" and "extreme".  Dr. Pealman opined that Delong's ability to understand, remember, and carry out instructions was not affected by her impairments.  Applying the above scale, Dr. Pearlman rated as "none"[3] Delong's ability to

---

[3] None was defined as absent or minimal limitations.  If limitations are present they are transient and/or expectable reactions.

understand and remember short, simple instructions, carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions, and the ability to make judgments on simple work-related decisions.  Dr. Pearlman based his conclusion on the results of his mental status examination, which showed that Delong's cognitive functions were intact.  (Tr. 848).  Also, Dr. Pearlman opined that Delong would be able to respond appropriately to supervision, co-workers, and work pressures in a work setting.  Again, applying the above scale, Dr. Pearlman found Delong had "moderate"[4] limitations with respect to Delong's ability to interact with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting.   In addition, Dr. Pearlman wrote an evaluation of Delong.  (Tr. 844-847).  Dr. Pearlman wrote:

> Ms. Delong is demonstrating the hallmark features of Dependent Personality Disorder.  She has difficulty dealing with ordinary stressors of life.  The advent of a second infant overwhelmed her coping mechanisms.  The multiple physical and psychological symptoms that have been diagnosed as chronic fatigue syndrome and fibromyalgia are essentially physical expressions of underlying emotional conflicts relating to dependent personality function.  A positive Epstein-Barr antigen test cannot be construed as diagnostic of ongoing organic pathology.  If an individual has been afflicted with but has recovered from the acute infects of Epstein-Barr virus, the immune system will continue to demonstrate evidence of the previous infection.

> It seems reasonable to postulate that following the birth of her second infant, Ms. Delong experienced postpartum depression (description of emotional rages).  Current psychological presentation demonstrates dependency of personality.  Ms. Delong functions in basic activities of daily living.  She socializes with friends.  She takes care of her children.

> I obtain no history of panic attacks.  No psychotic thought processes are evident.  Ms. Delong reasons appropriately.   She is capable of functioning in occupational,

---

[4] Moderate was defined as having a moderate limitation in this area but the individual is still able to function satisfactorily.

personal, and social adjustment situations if she motivates herself to do so and is counseled concerning dependent personality dysfunction. Memory and concentration are satisfactory. (Tr. 846).

A non-examining physician employed by the disability determination unit reviewed Delong's medical records and completed a Residual Functional Capacity Assessment on September 15, 2003. (Tr. 809-816). Based on the his review of Delong's medical records, the non-examining physician concluded that Delong had no postural limitations, could occasionally lift/carry up to 50 pounds, could frequently lift and/or carry 25 pounds, stand and sit about 6 hours in an 8 hour day, and had no restrictions/limitations with pushing/pulling. (Tr. 809-816).

Here, substantial evidence supports the ALJ's finding that none of Delong's impairments (fibromyalgia, degenerative changes of the spine and knees, and a depressive disorder with anxiety) met or equaled a listed impairment on or before the date she was last insured on December 31, 2003.[5]

_____

[5] The Court has considered the medical evidence as a whole, namely the medical evidence submitted to the ALJ, as well the medical evidence submitted to the Appeals Council. *See Higginbotham v. Barnhart*, 405 F.3d 332 (5th Cir. 2005). As to the medical records submitted by Delong that have not been previously considered by the ALJ or the Appeals Council, the Court finds that the medical records do not support Delong's request for a remand because the records do not relate back to the time period for which benefits were sought. The Social Security regulations provide that the Court may consider evidence presented to it for the first time when the evidence is new and material and good cause is shown for not presenting it in an earlier proceeding. 42 U.S.C. § 405(g). Here, it is undisputed that the evidence is new and material, as Delong was not referred by Dr. Fogarty to Dr. Masroor Ahmed for an evaluation until September 25, 2005, for her complaints of pain management resulting from neck, thoracic, and low back pain. Based on his examination of Delong, which revealed that she was in "mild distress," Dr. Ahmed noted that Delong had almost full flexion on the back, her extension was moderately reduced while extension with rotational movement reproduced pain. She had no motor or sensory deficit, her SLR and sciatic tension signs were negative and she could heel and toe walk. As to her neck, Delong had a full range of motion on flexion, limited extension and side bending. Also, she had tenderness in paracervical area with overlying muscle involvement. In addition to the physical examination, Delong had a MRI of the lumbar spine on September 1, 2005, which showed lumbar disc degeneration, minimal bulging and posterior hypertrophy resulting in a very mild degree of central stenosis at L4-L5 and mild central stenosis at L3-L4. Dr. Ahmed recommended that Delong undergo a right lumbar facet joint block at 4 levels. The records show that Delong twice had facet injections, the first on October 4, 2005,

Similarly, substantial evidence supports the ALJ's finding that Delong's impairments of Raynaud's syndrome and TMJ were not severe impairments. In addition, substantial evidence supports the ALJ's finding that Delong retained the RFC for sedentary work involving simple, repetitive tasks in a low stress work setting. This factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial

---

and the second on November 9, 2005. Delong responded favorably to the first right lumbar facet and S1 joint block. Because Delong's insured status expired on December 30, 2003, the medical records from Dr. Ahmed do not relate to the time period for which benefits were sought, and, as such, are neither new and material. Evidence is "material" if it gives rise to a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered and the evidence must relate to the claimant's condition during the relevant time period, which in the instant action is on or before December 31, 2003. Here, none of the medical records relate to Delong's condition during the relevant time period. *See McClendon v. Barnhart*, 184 Fed. Appx. 430 at *1 (5th Cir. 2006) ("If a claimant has a degenerative or onging impairment, the relevant inquiry is whether the claimant [was] actually disabled during the relevant time, not whether a disease existed that ultimately progressed to a disabling condition. Evidence showing a degeneration of a claimant's condition after the expiration of [her] insured status is not relevant to the Commissioner's Title II disability analysis.")

evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d

172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight

than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any

physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting

*Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and

diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability

status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical

opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's

opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of
        record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling

weight on the issue of disability, in most cases such opinions must at least be given considerable

deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social

Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically
> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the
> other substantial evidence in the case record means only that the opinion is not
> entitled to "controlling weight," not that the opinion should be rejected.  Treating
> source medical opinions are still entitled to deference and must be weighed using all
> of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating
> source's medical opinion will be entitled to the greatest weight and should be
> adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight

to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule

provides that "adjudicators must weigh medical source statements under the rules set out in 20

C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician

can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

§ 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v.

Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the

Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in

administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical

records and testimony, and that her determination reflects those findings accurately.  The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to various

records, including the opinions of Dr. Salvato, in nearly eight pages of her decision.  With respect

to Dr. Salvato's opinion, the ALJ wrote:

> The undersigned considered the reports by Dr. Salvato indicating that the claimant
> presented to her office with diagnoses of fibromyalgia, chronic fatigue syndrome, and

23

TMJ by Dr. Ali (Exhibit 12F, page 4).  Although Dr. Ali diagnosed fibromyalgia (Exhibit 5F, pages 2, 5, 6 and 14), and although the claimant provided a history of chronic fatigue to Dr. Ali (Exhibit 5F, page 3), there is no documentation of a diagnosis of chronic fatigue syndrome in Dr. Ali's reports.  Dr. Salvato saw the claimant two times, both in October 2003.  Although Dr. Salvato stated in her narrative report that the claimant had a history of swollen lymph nodes, and her examinations of the claimant revealed enlarged cervical lymph nodes, the two treating notes of Dr. Salvato dated October 2003 do not document this finding (Exhibit 12F, pages 10 and 16).  The examination of the claimant's neck by Dr. Ali in April 2003 revealed no enlarged lymph nodes (Exhibit 5F, page 13).  Although Dr. Salvato stated that the claimant had demonstrated findings of non-exeudative pharyngitis on two out of three visits, there are treating notes for only two visits (October 6 and 22).  Dr. Salvato stated that the claimant had erythema of the throat on both of those visits.  According to Dr. Salvato, "objective" data supporting the diagnosis of chronic fatigue syndrome included frequent sore throat and low grade fevers as well as lymphadenopathy.  Dr. Salvato's two notes refer to the claimant's allegation of frequent sore throat, and a treating note by Dr. Davis dated September 2003 indicates that the claimant complained of increasing sore throat (Exhibit 7F, page 2).  Dr. Salvato recorded temperatures of 99.7 and 99.6 (Exhibit 12F, pages 9 and 16).  The examination by Dr. Ali in April 2003 revealed that the claimant's temperature was 98.9 (Exhibit 5F, page 13).  A treating note by Dr. Cubbage dated October 16 (in between the two visits of Dr. Salvato) indicates that the claimant had no fever or sore throat (Exhibit 8F, page 2).

According to Dr. Salvato, the examinations revealed 16 of 18 and 12 of 18 tender points (Exhibit 12F, pages 10 and 18).  She did not provide the specific tender points although her narrative report indicates that the tender points were above and below the waist and on the right and left side of the body.  She diagnosed fibromyalgia.  As indicated above, this diagnosis was established by Dr. Ali, a rheumatologist, and has been considered in reaching a determination regarding the claimant's functional capacity.

There is no documentation that Dr. Salvato has seen the claimant for 6 or more consecutive months in order to find that she has the required concurrence of four or more specific symptoms as required for a diagnosis of chronic fatigue syndrome as set out above nor does the evidence as a whole support that finding.  In her narrative report Dr. Salvato stated that she saw the claimant in December 2003.  While there is laboratory workup with a December 2003 date, there is no treating note for December 2003.  In any event, there is no documentation that Dr. Salvato saw and examined the claimant during a six month period of time.

There is no evidence to support a diagnosis of chronic fatigue syndrome as defined under Social Security Ruling 99-2p.  The undersigned does not accept as credible Dr.

24

Salvato's opinion that the claimant lacks the capacity to be gainfully employed on a regular sustained basis due to her diagnosis of chronic fatigue syndrome and fibromyalgia for the reasons stated above.  Dr. Salvato's conclusion that the claimant's debilitating fatigue, weakness and inability to concentrate on a task for more than a few minutes at a time severely impaired her ability to function in full time or even part time employment on a consistent basis is inconsistent with the claimant's activities of daily living as set out above, specifically her statement that she was a "stay at home mother" and cared for her two children who required "constant attention and care" (Exhibit 6E, page 9) and her testimony that she was the sole caretaker for two children ages 4 and 5 ½.  The regulations state that if a treating source's opinion on the issue of the nature and severity of a claimant's impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the opinion will be given controlling weight (20 C.R.F. 404.1527).  Based on the evaluation above, the undersigned is not required to give controlling weight to the opinion of Dr. Salvato.  Because of the discrepancies noted above, the undersigned gives very little, if any, weight to Dr. Salvato's opinion.  (Tr. 680-682).

None of the medical opinions submitted support the conclusion that Delong was disabled on or before December 31, 2003.  The ALJ did not err in her assessment of the medical opinions.  To the extent Delong argues that the ALJ erred by not giving controlling weight to Dr. Salvato's opinion regarding the nature, severity and limitations as a result of fibromyalgia, the ALJ's thorough decision sets forth, in specific detail, her conclusions concerning the appropriate weight to give Dr. Salvato's decision based on limited number of times that Dr. Salvato examined Delong, particularly in light of the totality of the evidence during the relevant time period, namely, on or before December 31, 2003.  To the extent Delong's medical records after the expiration of her insured status suggest a change in her medical condition, there are no medical records to support the conclusion that she was disabled within the meaning of the Act prior to the expiration of her insured status or on or before December 31, 2003.  To qualify for DIB, Delong must prove she became disabled prior to the expiration of her insured status.  42 U.S.C. § 423(a)(1)(A),(c)(1)(B), 20 C.F.R. 404.101(a),

404.131(a); *Barraza v. Barnhart*, 61 Fed Appx. 917, 2003 WL 1098841, at *1 (5th Cir. 2003) (citing *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 19900). Moreover, "evidence showing a degeneration of a claimant's condition after the expiration of her Title II insured status is not relevant to the Commissioner's Title II disability analysis." *See Barraza*, at *1, (citing *Torres v. Shalala*, 48 F.3d 887, 894 n.12 (5th Cir. 1995)). Other than Dr. Salvato's opinion that Delong would not be able to perform substantial gainful activity as a result of CFS and fibromyalgia, none of Delong's other treating doctors such as Dr. Ali, Dr. Fogarty or Dr. Cubbage expressed a specific opinion that she was disabled on or before December 31, 2003, despite their repeated references to muscle tenderness or other symptoms consistent with a diagnosis of fibromyalgia. Likewise, Dr. Pearlman noted no such limitations. Instead, Dr. Pearlman attributed the majority of Delong's complaints to her having a dependent personality disorder, a diagnosis that was not refuted by Dr. Salvato in her written response to Dr. Pearlman's report. Moreover, fibromyalgia is not *per se* disabling. *See Potts v. Secretary of HHS*, 1 F.3d 1241, 1993 WL 303363, at *6 (6th Cir. 1993); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that [the claimant] had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling."). As such, the fact that Delong had been diagnosed with fibromyalgia during the relevant time period does not mean she was disabled. To the extent that Delong relies on medical records after the date she was last insured, such records are insufficient, in and of themselves, to establish the existence of a disabling impairment during the relevant time period. The issue here is whether Delong was actually disabled on or before December 31, 2003, and not whether there has been a progression of her severe impairments such that had she still been insured, and her claim were reviewed today, the ALJ's decision could be different. Based on the

totality of the medical evidence, the ALJ did not error in finding that Delong was not disabled within the meaning of the Act prior to the expiration of her insured status on December 31, 2003.  In light of the medical records submitted, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

27

Here, Delong and her husband, Matthew Delong, testified about her condition.  Delong testified that she stopped working in June 1998 due to her desire to stay home and raise her children. (Tr. 992).  Delong estimated she could sit about an hour, could stand for 15 minutes, could lift 10 pounds, and could walk 1/8 of a mile, once a month.  (Tr. 997-999).  According to Delong, "I hurt from head to toe.  I almost always have a headache.  I have severe TMJ which I had a little bit of physical therapy for."  (Tr. 199).  With respect to her pain, Delong testified she has a sore throat, right shoulder pain, elbow pain, wrist pain, neck pain, lower back pain, hip pain, feet pain, and ankle pain.  (Tr. 999-1000, 1001).  Also, she stated her feet are always cold.  (Tr. 1000-1001).  However, Delong acknowledged that since starting Oxycontin in May 2004, her level of pain had improved. According to Delong, "I started taking two Oxycontin at bedtime.  That would last me through the night and I could get up in the morning and not be in very much pain.  And then during the day, I take the hydrocodone for pain.  Whereas before I was only taking the hydrocodone and I would wake up and barely could move some mornings."  (Tr. 1005).  She added that "so four or five hours during the day, if I'm standing still or sitting still, or not doing any housework or anything, I'm pain free." (Tr. 1005).  With respect to any side effects from the medication, Delong testified that "with the [x]anax and hydrocodone, I often, I'm in a fog.  I can't function, I can't think."  (Tr. 1008).  As to her daily activities, Delong testified that she is able to drive.  As an example, Delong testified that she recently had driven her two children and a neighbor and her children to the mall.  (Tr. 1010). Also, Delong testified that she attends church but avoids going to the grocery store, where she rides a cart.  (Tr. 1011, 1013-1014).  Delong and her family have also gone on vacation.  (Tr. 1015-1016). Delong testified that she also watches television, reads and takes care of her personal needs, and also takes care of her four year old and five and a half year old.  (Tr. 1011, 1012, 1015).  With respect to

duties around the house, Delong testified she does not clean but is able to load and unload the dishwasher. (Tr. 1013). Delong stated that she has "no patience." (Tr. 1012). In addition to Delong's testimony, her husband testified about her impairments. According to her husband, she has a "lack of energy, basically, is what it all seems to boil down to. And the pain that goes along with her ailment." (Tr. 1020). Based on the reasons which follow, the ALJ rejected Delong's testimony as not fully credible:

> The claimant testified that she stopped working (in 1998) due to pregnancy, and she wanted to stay home to watch her children. She was asked why she could not work now, and she responded that her children do not go to school full time yet, adding that when they went to school full time she intended to find "something." Wanting to stay home with your children is not a basis for a finding of disability under the Social Security act.

> The claimant was asked why she could not function in an office position or any other position, and she responded that she physically could not do the work because of fibromyalgia and mentally she could not do the work due to fibromyalgia "fog." She stated that to do her past work she needed to be multi tasked, and she did good to handle one thing at a time. Although the claimant alleged that she experienced fibromyalgia "fog," the mental status examination by Dr. Pearlman revealed that her memory and concentration were satisfactory (Exhibit 11F).

> The claimant testified that she could sit about an hour at a time, stand 15 minutes, walk a short block (about 1/8 of a mile), and lift 10 pounds. The claimant's statements regarding functional capacity are not consistent with her testimony that she went to the mall for 4 hours the day before the hearing. Her testimony regarding functional limitations appears to be self serving.

> The claimant's testimony that her right shoulder popped in and out of place when she changed clothes or lifted something has no medical basis. The claimant has complained of multiple symptoms to her doctors, but there is no documentation that she has voiced this concern with any doctors. She also stated that her elbows and wrists were painful and weak. Examinations in March and May 2003 by Dr. Fogarty revealed that there was tenderness over the medial elbows and slight numbness along the ulnar side of the forearm and wrist (Exhibit 4F, page3). The examination in May 2003 revealed "good" grip strength. This treating note also describes the claimant as "healthy appearing for age" (Exhibit 4F, page 2). The examination by Dr. Ali in

April 2003 revealed normal muscle strength in all extremities (Exhibit 5F, page 14). The claimant's allegation of painful and weak elbows and wrists is exaggerated.

The claimant testified that she had bulging discs in her neck, and she "constantly" had neck pain. The MRI scan of the cervical spine showed disc protrusion at one level (Exhibit 8F, page 6). However, her examinations have not revealed any neurological deficits of the upper extremities. According to the claimant, nothing took the pain away. A treating note dated May 2003 by Dr. Fogarty indicates that the range of motion of the neck was "good." No abnormalities were noted with respect to the neck. The claimant's allegation of lower back pain has no medical basis.

The claimant testified that her hips gave her a great deal of trouble, and she had three pins in the right hip due to a condition in 1974. A treating note by Dr. Fogarty dated December 2002 indicates that the claimant stated that she had "intermittent" pain over the right hip, but it was "not" severe. Dr. Fogarty noted that she had pinning as a teenager. An X-ray showed metallic devices. The physical examination at that time revealed a well healed scar and no tenderness over the right hip (Exhibit 4F, page 4). The claimant's testimony that her hips gave her a great deal of trouble is not supported by objective clinical findings or even her statements to Dr. Fogarty.

The claimant's testimony that she had surgery on both knees is supported by the medical records in evidence, but examinations after the surgeries revealed a normal gait, and there are no findings on examinations that suggest that sedentary work is precluded.

The claimant testified that she took pain medication so that she did not have excruciating pain. There is no documentation of a medically determinable impairment that would cause excruciating pain. Her activities of daily living indicate that she does not experience excruciating pain, and this allegation is clearly exaggerated.

The claimant testified that she experienced adverse side effects from medication, such as being in a "fog" and being unable to function and think. There is no evidence that she told her doctor that she experienced adverse side effects from medications so that an adjustment could be made. The adverse side effects apparently do not prevent her from driving as indicated in her testimony that she last drove the day before the hearing.

The claimant testified that she was seeing a counselor, not a psychiatrist or psychologist. She stated that she had been treated for depression and anxiety in 2001 by a psychiatrist or psychologist (at Psychiatric Management Solutions). She stated she was treated with medication. According to the claimant, she was seeing a

counselor for "stress" and marital issues (which had much improved).  It was her testimony that she had never been hospitalized for a mental impairment.

The claimant's husband testified that the claimant's most significant problems were a lack of energy and pain.  He did not think that she had improved since seeing Dr. Salvato.  He stated that the counseling was not really marital counseling but for help in understanding the claimant's condition.  He stated that it had been difficult to accept and understand her condition, and this  had been a burden on the family.  The claimant's husband's testimony indicates that he believes that the claimant is disabled due to her condition.  However, the evidence as a whole supports a conclusion that the claimant can perform at least sedentary work.

The claimant's earnings record documents a good work history through 1998 (Exhibit 2D), a factor that indicates a motivation to work.  The claimant stated that she quit working in 1998 because of pregnancy.  A person's work history is one of many factors taken into consideration for a finding of credibility.  Other factors include the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms, and all of the evidence of record considered as a whole.  The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein; and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated. (Tr. 682-683).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly.  Based on this record, there are significant inconsistencies between Delong's subjective complaints and the objective medical evidence.  The ALJ identified the inconsistencies and gave specific reasons for rejecting Delong's subjective complaints, such as discrepancies in her statements in light of the medical evidence and the lack of medical evidence to support her subjective symptoms.  Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Delong, at the time of the hearing, was thirty-eight years old, and had completed high school.   The ALJ questioned Thomas King, Ph.D., a vocational expert ("VE"), at the hearing about Delong's ability to engage in gainful work activities.   "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'"  *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.   *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).   A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical question to the VE:

Q.  Please assume the following hypothetical individual who has the same vocational profile as the claimant, that is a younger individual, with a high school education and past relevant work as you described it.  And further assume that such individual has medically determinable impairments including Raynaud disease, a disc degeneration condition, TMJ, chronic fatigue, fibromyalgia and headaches.  And that her condition is associated with chronic pain, a symptomotology, and fatigue.  And as a result, has some side effects of medication, including some decreased ability to concentrate.  As a result, such hypothetical individual would be limited to simple, repetitive task and low stress, work setting. Do you have an opinion regarding whether there would be any jobs available for such hypothetical individual?

A. Yes,  Judge, under that hypothetical, a person could perform sedentary, unskilled work.  (Tr. 1026).

Specifically, the VE testified that Delong, based on that hypothetical, could perform job such as an order clerk, sorter, and addresser.  (Tr. 1027).  In addition, the VE was asked a follow-up hypothetical question by the ALJ:

Q.  In the next hypothetical, I want you to assume the following individual, such individual would be able to sit for one hour at a time, and such individual would be able to be on her feet for 15 minutes at a time.  Such individual would be able to lift up to 10 pounds occasionally.  And such individual, in the work setting that would allow for a 15 minute break in the morning and a 15 minute break in the afternoon, and an hour break for lunch.  Would that change your testimony regarding these jobs?

A.  Yes.

Q.  In what way?

A.  I would say a person could not perform sedentary work under that hypothetical.

Q.  And why is that?

A.  Because of her sitting limitations and the standing limitation.

Q.  One hour at a time during course of an eight hour, maybe I misstated it.  One hour at a time for a total of six hours out of an eight hour day.

A.  Oh, Ok.

33

Q.  And 15 minutes at a time for a total of no more than two hours at a time.

A.  Yes, no, that would not change my testimony.

Q.  And then in the next hypothetical, assume that such individual needed more than the usual morning and afternoon breaks.  Would that change your testimony?

A.  No, Judge it would not.

Q.  I'm sorry.

A.  I mean, it would, I'm sorry.

Q.  In what way?

A.  Under that hypothetical a person taking more than the 15 minute breaks in the morning and the afternoon, would not be able to do those jobs.  (Tr. 1027-1028).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Indeed, the hypothetical question incorporated ALJ of Delong's impairments that are supported by the medical records.  Because the medical evidence did not support Delong's contention that she was impaired as as a result of  "fatigue, fever, weakness, recent weight change, rashes, headaches, floaters, dizziness, nasal stuffiness, colored nasal discharge, post-nasal drip, frequent sore throat, swollen glands, cough, shortness of breath, chest pain, palpitation, dyspnea, vomiting, loss of appetite, indigestion, diarrhea, stomach pain, urinary problems, muscular pain, joint pain, tension and depression" (Document No. 19, p. 54), the ALJ did not error in not including such limitations in the hypothetical question.  Upon this record, the ALJ considered and included in his hypothetical questions the impairments supported by the record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Delong was not disabled on or before December 31, 2003.  Based on the testimony of the

34

vocational expert and the medical records, substantial evidence supports the ALJ's finding that Delong could perform sedentary work involving simple, repetitive tasks in a low stress work setting. Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Delong was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Delong was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 19), is DENIED, Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 16th day of  April, 2007

Frances H. Stacy
United States Magistrate Judge